3 P.3d 149

2000-NMCA-041

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Wilma Kay COOPER, Defendant–
Appellant.**

**No. 20,300.**

Court of Appeals of New Mexico.

April 14, 2000.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Appellee.

Phyllis H. Subin, Chief Public Defender, Carolyn R. Glick, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

BOSSON, Judge.

{1}   Defendant appeals her conviction for battery upon a peace officer, NMSA 1978, § 30–22–24 (1971).   Defendant contends her conviction should be reversed for four reasons:  (1) the trial court refused to instruct the jury that her challenge to the officer's authority had to be "meaningful," pursuant to *State v. Padilla*, 1997–NMSC–022, ¶ 7, 123 N.M. 216, 937 P.2d 492;  (2) the trial court erred by allowing Defendant to be convicted based on the threatening actions of others, not Defendant, that occurred after the battery;  (3) the evidence was insufficient to sustain her conviction;  and (4) prosecutorial misconduct.  *State v. Jones*, 129 N.M. 165,

¶ 9, 3 P.3d 145, ¶ 9 (Ct.App.2000), filed contemporaneously with this case, requires the jury instruction to state that a defendant's conduct "meaningfully challenges an officer's authority" when the defense requests such language.   Based on the reasoning of that opinion, we reverse and remand for a new trial with an appropriate jury instruction. We discuss the remaining appellate issues as they pertain to retrial.

## BACKGROUND

{2}   After her brother's funeral, Defendant attended a gathering of family and friends at a private residence.   A policeman, Officer Grau, arrived at the residence to investigate Defendant's nephew, Joseph Foster, for reckless driving.   In the presence of about five guests, Foster cursed the officer. Defendant approached the two in an effort to calm down Foster and help the officer. When the officer requested his driver's license, Foster refused to comply and began to walk away.   The officer grabbed Foster's arm and again requested a license.   By this time the crowd had grown to seven or eight people, who were encouraging Foster to cooperate with the officer.

{3}   Meanwhile, a second officer, Detective Jackson, drove by and noticed the officer in the middle of the crowd with Foster who was waiving his arms defiantly.   Detective Jackson stopped to assist Officer Grau at the scene.   Although the crowd, now ten to thirteen people, continued to urge Foster to cooperate, Detective Jackson testified that their shouts caused Foster to become more disruptive.   To defuse the situation, the officers attempted to separate Foster from the crowd.   As they did so, Foster grabbed Defendant Wilma Kay Cooper and told the officers that he wanted his aunt (Defendant) to come with him.

{4}   Detective Jackson told Defendant that she could not go with Foster, but the pair advanced towards the officers nonetheless.   Detective Jackson twice held up his hands and asked Defendant to stop.   Foster and Defendant continued to walk towards the officers, and again Detective Jackson raised his hands and ordered Defendant to stay back.   According to the testimony, Detective Jackson may have put his hand in Defen-

dant's face, and Defendant responded by slapping the Detective's hand away and telling Detective Jackson to keep his hand out of her face. At this time, Detective Jackson told Defendant that she was under arrest. Defendant retorted that Detective Jackson could not arrest her, and the crowd echoed her protest.

{5} Detective Jackson repeatedly tried to get hold of Defendant's arm, but Defendant kept turning away. Finally, Detective Jackson succeeded in grabbing Defendant's shirt sleeve, and her arm was pulled out of the sleeve. At this point, the crowd, now about twenty in number, "swarmed" the pair "almost like a mob" and tried to separate Defendant from Detective Jackson. The crowd pinned Detective Jackson and Defendant against the back of a parked car. Concerned for his safety, Detective Jackson called for assistance. Then someone (not Defendant) struck Detective Jackson's head, such that his glasses were torn off and he became dizzy. The blow to the head caused Detective Jackson to let go of Defendant and draw his side arm to force the crowd away. Defendant was arrested and then charged with battery upon a police officer, resisting arrest, and disturbing the peace. After her conviction of all three crimes, Defendant appeals only her felony conviction for battery upon a peace officer.

## DISCUSSION

{6} Defendant's first argument is that her conviction should be reversed because the trial court did not use the jury instruction outlined in *Padilla*, 1997–NMSC–022, ¶ 7, 123 N.M. 216, 937 P.2d 492. This instruction would have informed the jury members that to convict Defendant, they had to find that her battery (slapping the detective's hand) posed an "actual injury, actual threat to safety, or [a] meaningful challenge to authority." *Id.* The merits of this argument are addressed in the companion case to this appeal and will not be reiterated at length. *See Jones*, 129 N.M. 165, ¶¶ 9–11, 3 P.3d 145–46, ¶¶ 9–11. Defendant requested an instruction phrased in the language of *Padilla*, which was denied. Defendant also introduced evidence that she slapped the de-

tective's hand away from her face because Detective Jackson was being rude and disrespectful; she claimed she was not intending to challenge the officer's authority or to threaten his safety. Because this evidence, if believed, could rebut the charge of an "unlawful" battery upon a peace officer, as defined in Section 30–22–24 and amplified by *Padilla*, the court's failure to instruct as requested was reversible error and mandates a new trial. *See Padilla*, 1997–NMSC–022, ¶ 11, 123 N.M. 216, 937 P.2d 492; *see also State v. Magby*, 1998–NMSC–042, ¶ 14, 126 N.M. 361, 969 P.2d 965 (holding that instruction which misdirected jurors as to the appropriate standard constitutes reversible error). The remaining issues are discussed insofar as they relate to the resolution of this case on remand.

{7} Defendant argues that the trial court also erred as a matter of law by allowing the State to pursue a theory that her battery constituted a threat to the officer's safety, based solely on what occurred thereafter. The State was allowed to present a kind of domino theory; that "but for" slapping the officer's hand, Detective Jackson would not have arrested Defendant, then Defendant would not have resisted her arrest, and finally, the crowd would not have become hostile to the point of attacking Detective Jackson. The State asserts that by slapping the officer, "*coupled* with retreating and asserting he could not arrest her," Defendant "*incited* the already excited crowd to close in and physically attack [Detective] Jackson." (Emphasis added.) The crux of the issue is whether the State was entitled to prove an "actual threat to safety" by virtue of Defendant's conduct (resisting arrest) that occurred *after* the battery and for which she was separately charged and convicted.

{8} Defendant urges this Court, as she did the jury, to confine the scope of the evidence under consideration to the circumstances existing at the time of the hand slap, and whether that slap, taken in context, meaningfully challenged the officer's authority or actually threatened his safety. Defendant's argument was not successful at trial. In response to this argument, the State told the jury to "look very closely at your jury

instructions, especially [the battery upon a peace officer instruction,] there is not a single reference in that jury instruction to two things the defense is trying to tell you. First of all, ... the language out of the instruction reads 'the Defendant's conduct' threatens the officer's safety, not a single act or a simple act." Defendant objected to the State's interpretation of the instruction. At the bench conference that followed, the trial judge determined that it was up to the jury to decide what the term "conduct" in the instruction meant: whether the conduct at issue was limited to the simple act of the battery or included Defendant's behavior afterwards, including her resisting arrest.

{9} We believe that the "conduct" referred to in the jury instruction, and implied in the statute, means Defendant's conduct leading up to and including the slap, and anything she did or said afterwards that explained her reasons for touching the officer. This would not include, however, Defendant's response, or that of the crowd, to the officer's intervening decision to arrest her. Defendant, after all, was charged with battery, not inciting a riot. Her acts of resisting arrest and disturbing the peace were already the basis for separate prosecutions. We think the legislature intended the jury to concentrate on the touching and its impact in light of the immediate circumstances, not what happened two or three events later, which, we emphasize, resulted in convictions unchallenged by this appeal.

{10} *People v. Gentry*, 48 Ill.App.3d 900, 6 Ill.Dec. 617, 363 N.E.2d 146 (1977), is a case on point. In *Gentry*, a policeman confronted the defendant while investigating a shooting. *See id.* 6 Ill.Dec. 617, 363 N.E.2d at 147. The defendant became argumentative with the police. *See id.* This exchange took place in a crowd of about thirty observers. *See id.* According to the officer, the defendant pulled away when he attempted an arrest. *See id.* When the policeman finally grabbed the defendant, he was attacked by the crowd, but not by the defendant. *Id.* 6 Ill.Dec. 617, 363 N.E.2d at 148. At trial for disorderly conduct (he was also convicted of resisting arrest), the police testified that the defendant was "in the process of committing" disorderly conduct as he argued with the police. Disorderly conduct was defined as an

act which "creates a clear and present danger of a breach of [the] peace or an imminent threat of violence." *Id.* 6 Ill.Dec. 617, 363 N.E.2d at 150 (citation and internal quotation marks omitted). The prosecution relied on the fight following the arrest as evidence of a breach of the peace sufficient to support a disorderly conduct conviction. The appellate court disagreed, pointing out, "[T]his disturbance occurred *after* defendant was arrested and involved family and friends of defendant, who were obviously incensed over his arrest. Nothing in the record suggests defendant's conduct prior to this time threatened a breach of the peace." *Id.* Further, *Gentry* held that the defendant could not be accountable for the size of the gathering crowd, stating that a person's behavior "does not evolve into a crime simply because persons standing nearby stop, look and listen." *Id.* We find *Gentry*'s approach instructive.

{11} The State is correct that battery is not judged in a vacuum. It must be viewed in light of the factual setting to determine whether an actual threat to safety or a meaningful challenge to authority occurred. *See Jones*, 129 N.M. 165, ¶ 9, 3 P.3d 145, ¶ 9. For instance, the defendant in *Padilla*, 1997-NMSC–022, ¶ 3, 123 N.M. 216, 937 P.2d 492 instigated a disturbance in jail by fighting and kicking his cell door. This conduct led another inmate to defy a correctional officer's order for everyone to return to their cells. *See id.* The defendant was aware that a one man rebellion against the authority of the corrections officers was under way, and chose to aggravate it by pouring baby oil on the officers while they restrained the hostile inmate. *See id.* A jailer testified that the inmate was more difficult to restrain because of the baby oil. *See id.* The defendant's actions could have constituted an "actual threat" to officer safety because of the surrounding circumstances. But the court did not rely upon an unraveling chain of causation, as in the case at bar, to hold the accused responsible for intervening events outside the immediate scope of his actions.

{12} The trial court initially observed that any conduct after the hand slap was irrelevant to the battery charge. Later in the trial, however, the court reversed course. During closing arguments, the pros-

ecution argued that Defendant's conduct under the battery statute included her post-battery actions of resisting arrest. We believe the trial court had it right the first time. Defendant's conduct after the slap was too attenuated from the slap itself to prove an actual threat to safety or a meaningful challenge to authority.

{13} Confining the State to the immediate events of the battery hardly renders Defendant immune from the statute's reach. Detective Jackson testified that, before the hand slap, Defendant repeatedly disobeyed his orders to stay back. When Detective Jackson pointed at Defendant and commanded her to stop, she slapped his hand and said something along the lines of, "You don't have to put your finger in my face." This alone could reasonably be construed as a meaningful challenge to the detective's attempt to assert his lawful authority. We hold only that there was insufficient evidence to justify a conviction under the "safety" prong of the statute.

{14} Defendant's final argument on appeal is that the prosecutor's closing argument warranted a mistrial. After arguing the evidence against Defendant, the prosecutor implored the jury to "think of one other thing by your verdict today, you can send a message if you convict this ...," which drew a swift objection from Defendant. At the bench conference that followed, the trial court asked the prosecutor what message she wanted to send. The prosecutor responded that she wanted the jury to stand behind the officers and keep them out of harm's way. The judge correctly told counsel that the argument was improper and asked her not to make such a statement. The prosecutor resumed by asking the jurors to imagine what would happen if "we didn't have people like Phil Jackson, who puts his life on the line every single day to enforce those laws and protect this community. We have to protect these officers, ladies and gentlemen. We have to do whatever we can to keep them safe and out of harm's way. And to get there ...," which drew another objection. The judge recessed the jury so counsel could argue a mistrial motion.

{15} The sole duty of a prosecutor is to see that justice is done. *See State v.*

*Pennington,* 115 N.M. 372, 376, 851 P.2d 494, 498 (Ct.App.1993). Prosecutorial commentary that urges a jury to convict for reasons other than the evidence defies the law and undermines the integrity of a verdict. *See State v. Diaz,* 100 N.M. 210, 213–14, 668 P.2d 326, 329–30 (Ct.App.1983). While a prosecutor " 'may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' " *Id.* at 215, 668 P.2d at 331 (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). As we recently observed, this kind of "pandering is at best unprofessional; at worst, it places in jeopardy an otherwise just verdict." *See State v. Phillips,* 128 N.M. 777, ¶ 31, 999 P.2d 421, ¶ 31 (Ct.App.2000); *see also* ABA Standards for Criminal Justice, *The Prosecution Function & Defense Function* § 3–5.8(d) (3d ed.1993) (stating that the "prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence").

{16} Although we refrain, despite our concerns, from reviewing the mistrial motion, we urge prosecutors to adhere carefully to the trial judge's efforts to control argument during trial. *See Bell v. State,* 723 So.2d 896, 897 (Fla.Dist.Ct.App.1998) (cautioning district attorney not to consider the harmless error and fundamental error rules as "a license to violate both the substantive law and the ethical rules that prohibit improper argument"). This appellate court issue has been rendered moot due to our reversal on other grounds and remand for a new trial.

## CONCLUSION

{17} We reverse Defendant's conviction for battery upon a peace officer for lack of a proper instruction as requested.

{18} **IT IS SO ORDERED.**

BUSTAMANTE and ARMIJO, JJ., concur.