The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: January 29, 2026

**No. A-1-CA-41857**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**BOBBY CHARLES CRAWFORD,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Richard M. Jacquez, District Court Judge**

Raúl Torrez, Attorney General
Benjamin L. Lammons, Assistant Solicitor General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Attorney
Santa Fe, NM

for Appellant

## OPINION

**HOUGHTON, Judge.**

{1}     Defendant Bobby Crawford appeals his convictions for attempting to evade, shoot, and kill police officers. At trial, a jury found Defendant guilty of two counts of attempted first-degree murder, in violation of NMSA 1978, Section 30-28-1 (1963, amended 2024) and NMSA 1978, Section 30-2-1(A)(1) (1994); two counts of aggravated assault on a peace officer, in violation of NMSA 1978, Section 30-22-22(A)(1), (B) (1971); one count of shooting from a motor vehicle, in violation of NMSA 1978, Section 30-3-8(B) (1993); and one count of aggravated fleeing a law enforcement officer, in violation of NMSA 1978, Section 30-22-1.1(A), (B) (2022).[1] Defendant challenges all but the aggravated fleeing conviction, arguing that: (1) insufficient evidence of deliberate intent supports his convictions for attempted first-degree murder; (2) the State made improper arguments in its opening statement and closing arguments; and (3) several convictions constitute double jeopardy.

{2}     We affirm all convictions except Defendant's conviction for shooting from a motor vehicle. First, we hold that the evidence presented at trial allowed a reasonable jury to infer the deliberate intent element of attempted first-degree murder. Second, although some of the State's remarks in its opening and closing arguments were improper, we hold that they did not—singularly or cumulatively—deprive

---

[1]Defendant was also charged for being a felon in possession of a firearm, which was severed from this case and is not a basis of this appeal.

Defendant of his right to a fair trial. Third, we hold that convictions for both attempted murder and assault on a peace officer do not violate double jeopardy. Finally, we vacate Defendant's conviction for shooting from a motor vehicle because it violates the protection against double jeopardy.

**BACKGROUND**

{3} On June 21, 2023, the Las Cruces Police Department (LCPD) received a dispatch call from the New Mexico State Police (NMSP) for assistance with a vehicle pursuit. LCPD officers responded in marked police vehicles and joined NMSP's unmarked vehicles in pursuit of Defendant, who was driving a white SUV. Evidence of the pursuit prior to LCPD's involvement was not presented at trial, but LCPD officers testified that the chase lasted between five and ten minutes after they joined and reached speeds up to 70 miles per hour over a combination of paved and dirt roads, as well as through the desert, in a development on the outskirts of Las Cruces, New Mexico. One LCPD officer described the pursuit as "like a rodeo." Another described it as "almost comical the way it was going . . . over and over and we . . . were trying to dodge one another as officers in our units."

{4} After several unsuccessful attempts to disable Defendant's vehicle, Defendant drove through a gate into a residential property and passed between two bystanders before "plow[ing] through the fence line of that yard back into the desert." After several more minutes, Defendant was finally brought to a halt by a pursuit

intervention technique (PIT) maneuver executed by one of the LCPD officers, causing Defendant's car to spin out. By this time, there were at least seven separate law-enforcement vehicles involved: the three unmarked NMSP vehicles that had begun the pursuit and the four LCPD vehicles that responded to the dispatch. When Defendant was brought to a halt, he immediately fired a gun at the LCPD officers that had performed the PIT maneuver and boxed him in. The LCPD officers returned fire and took cover behind their patrol vehicles. One LCPD officer estimated that the exchange of gunfire lasted between three and fifteen seconds. None of the LCPD officers were struck by the rain of bullets that penetrated the cabins of their respective vehicles. Defendant barricaded himself in his vehicle and was subdued and arrested fifteen to twenty minutes after the shooting when a nearby SWAT team deployed chemical munitions.

{5}     Defendant was tried before a jury and found guilty on all but a third charged count of aggravated assault on a peace officer. Defendant now appeals.

**DISCUSSION**

**I.      There Was Sufficient Evidence Presented at Trial to Sustain a Conviction Based on Deliberate Intent**

{6}     Defendant alleges that the State presented insufficient evidence of deliberate intent. As a result, Defendant asks us to either reverse his conviction for attempted first-degree murder or to exercise our direct remand authority for entry of a conviction for attempted second-degree murder. Defendant does not dispute,

however, that "the shooting happened immediately after a prolonged car chase that ended when police made [him] spin out" and that the jury could have reasonably inferred intent to kill. He argues, rather, that there was no evidence of the *deliberation* requirement to support a conviction of attempted first-degree murder.

{7}     "[O]ur review of the trial record must defer to 'the jury's fundamental role as factfinder' yet satisfy our autonomous responsibility 'to ensure that . . . jury decisions are supportable by evidence in the record, rather than mere guess or conjecture.'" *State v. Bahney*, 2012-NMCA-039, ¶ 25, 274 P.3d 135 (quoting *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641). "We view the evidence in the light most favorable to the jury's guilty verdicts, which must be based upon proof beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). "We resolve all conflicts and make all permissible inferences in favor of the jury's verdict." *State v. Slade*, 2014-NMCA-088, ¶ 13, 331 P.3d 930 (text only) (citation omitted). "An inference is permissible if the evidence necessary to invoke the inference (the evidence as a whole, including the basic fact or facts) is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt." *State v. Barragan*, 2001-NMCA-086, ¶ 29, 131 N.M. 281, 34 P.3d 1157 (internal quotation marks and citation omitted), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 257 P.3d 110.

{8} We measure the sufficiency of the evidence against the jury instructions. *See State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409. Under New Mexico law:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and the slayer's reasons for and against such a choice.

UJI 14-201 NMRA.

{9} "A deliberate intention is rarely subject to proof by direct evidence and often must be inferred from the circumstances." *State v. Astorga*, 2015-NMSC-007, ¶ 60, 343 P.3d 1245 (citing *State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515). "Intent is subjective and is almost always inferred from other facts in the case . . . ." *Duran*, 2006-NMSC-035, ¶ 7 (internal quotation marks and citation omitted).

{10} Our inferred deliberate intent caselaw can be viewed on a spectrum. On one end are cases like *State v. Flores*, in which the record "support[ed] rational findings by a jury that [the d]efendant . . . acted deliberately rather than rashly and impulsively, in killing [the victim]" because "[t]he jury would have been amply justified in reasoning from the evidence . . . that [the d]efendant made and carried out a plan over a two-week period to exact revenge on [the victim] for rejecting him

and to make sure that if he could not have [the victim], no one else ever would." 2010-NMSC-002, ¶ 24 (internal quotation marks and citation omitted), *overruled on other grounds by State v. Martinez*, 2021-NMSC-002, 478 P.3d 880. On the other end are cases like *State v. Tafoya*, where "[t]he void of evidence to support deliberate intent . . . is filled with evidence of rash and impulsive behavior[:] . . . [the defendant and his victims] had been drinking and doing drugs earlier in the day, and they were drinking and doing drugs at the time of the shootings. They were listening to loud music and driving around town, and then [the d]efendant suddenly shot [the victims]." 2012-NMSC-030, ¶ 53, 285 P.3d 604.

{11} Along that spectrum, our appellate courts have sorted a number of cases involving deliberate intent. Among them, *Astorga* is the most factually similar to the instant case. Astorga was a fugitive who killed a sheriff's deputy during a routine traffic stop. *Astorga*, 2015-NMSC-007, ¶¶ 1-6. Astorga was convicted of first-degree murder for the killing. *Id.* ¶ 1. In the absence of eye witnesses, the State's evidence supporting deliberation was that the license plate number the deputy had given to dispatch at the outset of the traffic stop belonged to Astorga, who had an outstanding warrant and had been living under a different name; the deputy was shot twice from a distance of "less than 12 inches," indicating Astorga waited for the deputy to approach the driver's side window before shooting him; Astorga fled to Mexico after the deputy was killed; and Astorga later explained to a friend that he

had "started to do good again" until the sheriff's office "fucked it up," and confessed to an acquaintance that he "blasted that cop." *Id.* ¶¶ 4-8, 59-65.

{12}    Our Supreme Court upheld Astorga's first-degree murder conviction, holding:

> The jury could have reasonably inferred that, once [the d]efendant saw that he was being pulled over, he faced several options, including whether: (1) to cooperate with [the victim] during the stop and likely be arrested on the outstanding warrant; (2) to attempt to flee from [the victim]; or (3) the option that he chose—to wait for [the victim] to approach the truck and shoot him in the face at point-blank range. The jury could have found that [the d]efendant contemplated all of these choices and, even if he did not make his final decision until the last second, the decision to kill [the victim] was nonetheless a deliberate one.

*Id.* ¶ 63.

{13}    Defendant here faced the very same choice as Astorga: he could have surrendered, fled, or killed the officers to escape. To be sure, the State did not present evidence of Defendant's statements after the shooting, as it did in *Astorga*. But as our Supreme Court noted, Astorga's "statements, standing alone, might have been insufficient to prove [the d]efendant's deliberate intention." *Id.* ¶ 65. We have held that "the central inquiry of a crime based on premeditation" is "[the d]efendant's state of mind *before* the shooting." *Slade*, 2014-NMCA-088, ¶ 28. Compared to *Astorga*, there was more evidence of Defendant's actions in the moments prior to his decision to shoot and kill the officers. There were no eyewitnesses in *Astorga*, so the state relied on circumstantial evidence to show that he fatally shot the deputy at point-blank range during the traffic stop, indicating that he laid in wait while the

deputy approached. 2015-NMSC-007, ¶ 60. The jury then needed to infer that Astorga's decision was motivated to avoid arrest based on his outstanding arrest warrant and his efforts to conceal his identify in the months before the shooting. *See id.* ¶ 65.

{14}     Here, on the other hand, Defendant engaged in a lengthy and dangerous police chase, punctuated by LCPD's multiple attempts to disable Defendant's vehicle during the five-to-ten minutes that one officer testified was among the longest chases in his sixteen-year career. The jury heard testimony that at times during the chase Defendant reached speeds as high as 70 miles per hour, and that he crashed through a residential gated fence, narrowly missing two bystanders. By the time police ended the prolonged chase, it was plain that Defendant intended to avoid arrest at great risk to himself, the police, and bystanders.

{15}     The jury also heard evidence that Defendant "immediately" began firing at the LCPD officers once his car came to rest as a result of the PIT maneuver. Viewed in the light most favorable to the jury's verdict, the immediacy of Defendant's firing supports the conclusion that Defendant armed himself at some point during the chase prior to the PIT maneuver. Relatedly, the jury saw photographs of where the bullets fired by Defendant impacted the first officer's passenger window and the second officer's front windshield, and heard them both testify that the shots were aimed at head level, indicating an intent to kill instead of to intimidate or disable their

vehicles. Coupling those facts—that Defendant armed himself prior to being stopped and then immediately and repeatedly shot toward one officer with an intent to kill and then toward another officer with the same intent—the jury could have reasonably inferred that Defendant selected the final option on his decision matrix: kill the LCPD officers chasing him. We conclude that Defendant's arming himself with a gun during the chase and then firing at the officers immediately upon being brought to a halt is similar to Astorga's decision to arm himself and then shoot the deputy once he approached Astorga at his driver's side window.

{16} We distinguish Defendant's conduct here from that in *State v. Hernandez*, another case that involved an attempted first-degree murder during a flight from authorities. *See* 1998-NMCA-167, 126 N.M. 377, 970 P.2d 149. Hernandez "attempted to escape from custody while he was in the Otero County courthouse for a hearing." *Id.* ¶ 2. As Hernandez attempted to make his escape, he was tackled by a detention officer, and in the ensuing struggle Hernandez was able to take control of the officer's sidearm and fire a shot towards a court employee who ran to assist. *Id.* ¶ 4. Hernandez tried to continue firing, but both the cylinder and hammer of the officer's revolver were physically prevented from moving by the various authorities involved in the struggle. *Id.* ¶¶ 5-6. Throughout the altercation, Hernandez was shouting, "I'll kill you," "I'm going to shoot you," and "I'm going to shoot you again." *Id.* ¶¶ 5, 7.

{17} This Court reversed Hernandez's attempted first-degree murder conviction based on insufficient evidence because "[t]o say that [the d]efendant was deliberating during this sudden struggle would not leave any principled distinction between an impulsive killing and one that is deliberate and premeditated." *Id.* ¶ 14 (internal quotation marks and citation omitted). There was no evidence that showed Hernandez formed a deliberate intent to kill—or even obtained a gun—prior to attempting his escape, and this Court noted that "[the d]efendant did not reach for [the officer's] gun and fire it until immediately after [the officer] had tackled [the d]efendant from behind and a physical struggle . . . ensued." *Id.* By contrast, Defendant here brought the firearm with him, as did Astorga, and had the duration of the chase to consider whether to use it. And critically, Defendant immediately fired upon the LCPD officers when brought to a stop, evincing that he did in fact prepare himself with his gun during the prolonged chase.

{18} We acknowledge these facts presented a close call for the jury, but on appeal "[w]e view the evidence in the light most favorable to the jury's guilty verdicts" rendered at trial and draw all reasonable inferences in support thereof. *See Bahney*, 2012-NMCA-039, ¶¶ 25, 35 (internal quotation marks and citations omitted). In that light, we hold that a jury could have reasonably inferred that Defendant's actions were part of one continuous, escalating attempt to avoid being caught, and that Defendant made the deliberate decision to escape—including killing the officers if

necessary—before readying himself with the firearm and pulling the trigger. This is not a case where the evidence, viewed in the light most favorable to the verdict and with all reasonable inferences drawn, remains "equally consistent" with a rash impulse and with deliberate intent. *See State v. Garcia*, 1992-NMSC-048, ¶ 32, 114 N.M. 269, 837 P.2d 862 (internal quotation marks and citation omitted).

{19} We take care to note that an opportunity to deliberate alone is insufficient proof of deliberation, *see id.* ¶ 30, and that flight from police prior to a shooting is not irrefutable proof of deliberate intent. *See, e.g.*, *Hernandez*, 1998-NMCA-167, ¶ 10. These facts are simply indicators that, coupled with all the other evidence offered, a rational juror could have relied upon to find that Defendant deliberately intended to kill the officers chasing him.

## II. There Was No Fundamental Error

{20} Defendant claims three instances of prosecutorial misconduct that deprived him of his right to a fair trial, both singularly and cumulatively. None were preserved for appeal with a timely objection at trial, so we review these claims for fundamental error. *See State v. Sosa*, 2009-NMSC-056, ¶ 35, 147 N.M. 351, 223 P.3d 348.

{21} "To find fundamental error, we must be convinced that there is 'a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them.'" *State v. Medema*, 2025-NMCA-011, ¶ 32, ___ P.3d ___ (quoting *State v. DeGraff*, 2006-NMSC-011, ¶ 21, 139 N.M. 211, 131

P.3d 61). "Only in the most exceptional circumstances should we . . . determine that all the safeguards at the trial level have failed. Only [then] should we reverse the verdict of a jury and the judgment of a trial court." *Sosa*, 2009-NMSC-056, ¶ 25.

{22} "As with any fundamental error inquiry, we will upset a jury verdict only (1) when guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process." *Id.* ¶ 35.

{23} Our Supreme Court has held that prosecutorial misconduct amounts to fundamental error when it is "so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citation omitted). We now turn to each of Defendant's claims of error.

## A. The State's Comments About Hesitation

{24} Defendant contends that the State encouraged the jury to disregard the reasonable doubt standard by "mocking" defense counsel's focus on hesitation as it pertains to reasonable doubt. During closing argument, defense counsel read the jury instruction defining reasonable doubt as "the kind of doubt that would make a reasonable person . . . hesitate to act in the graver and more important affairs of life." UJI 14-5060 NMRA. Defense counsel then emphasized hesitation throughout

closing, highlighting aspects of the case that caused him to personally hesitate and urged the jury to do the same.

{25}     The State picked up on this theme in rebuttal, arguing, "[T]here were all these things that [defense counsel] was saying that caused him to hesitate to act. That's all good and well, but you know who couldn't hesitate to act? Sergeant Boehne and Sergeant Doyle. Because we heard if they did hesitate, they'd almost certainly be dead." Our courts have held that "closing argument, and rebuttal argument in particular, is necessarily responsive and extemporaneous, not always capable of the precision that goes into prepared remarks." *Sosa*, 2009-NMSC-056, ¶ 24.

{26}     Through that lens, we view the State's remarks as responsive to the defense's theme in closing and intended as a rhetorical flourish to repurpose defense counsel's own words in service of the State's case. At no point did the State urge the jury to ignore the jury instructions as written, nor did the State claim that the jury instructions were incorrect. In fact, moments after addressing the defense's theme of hesitation, the State returned the jury's focus to the jury instruction that directs the jury to "only focus on the evidence and the testimony presented." As for the State's creative repurposing of the defense's focus on hesitation, we detect no error and end our review.

**B.     The State's References to the Element of Intent**

{27}     Defendant argues that the State committed prosecutorial misconduct by misstating the element of deliberate intent throughout closing. In support, Defendant points to three places in the record. First, Defendant faults the State for "argu[ing] that the jury should find that [Defendant] acted with deliberate intent because he demonstrated 'intent to kill' rather than 'aimlessly shooting around.'" But nowhere in Defendant's citation to the State's closing does the State use the term, "deliberate intent," or ask the jury to draw a conclusion about *deliberate* intent. Upon review of the record, the State merely argued that the evidence that Defendant "shot through . . . Sergeant Doyle's window" supported "intent to kill" as opposed to "aimlessly shooting around." The State was required to show "intent to kill" to sustain a conviction for both first- or second-degree murder. Arguing how the evidence met that requirement was not improper.

{28}     Next, Defendant takes issue with the State's argument in rebuttal "that [Defendant's] choices were not mistaken or accidental, but 'something that you have to try to do.'" Defendant claims "[t]his argument was misleading, because non-accidental conduct is not necessarily deliberate." But the State never equated non-accidental conduct with a deliberate intent to kill. The State referenced "deliberate intent" just once within the entire cited passage, stating, "I'm very glad defense brought up the aggravated fleeing charge and the pursuit because that's where the intent, that deliberate intent, that's where that begins." The State's use of evidence

to support its theory that deliberate intent began to form during the pursuit was not in error. Moreover, the challenged portion of the State's rebuttal that contrasted mistaken conduct with intentional conduct was responsive to Defendant's argument that he was initially chased by "unmarked vehicles." Defendant's argument sought to sow doubt about whether Defendant knew he was being chased by police, which was relevant to several counts. Counts 3, 4, and 5, which charged aggravated assaults on three separate police officers, required the State to prove Defendant knew each victim "was a peace officer and was performing duties of a peace officer." Count 6, which charged aggravated fleeing a law enforcement officer, also required proof that Defendant "knew that a law enforcement officer had given [him] an audible or visual signal to stop."

{29}    Finally, Defendant claims the State incorrectly argued that "picking up and shooting a gun proves deliberate intent" by making the following argument: "[Defendant] reached over into that passenger seat, he grabbed the gun, he picked it up, he pointed at Sergeant Doyle, and then he fired, and then he fired again. So just that small sequence alone, that shows six thought-out and intentional choices that . . . [D]efendant made." Again, Defendant infers more than the State actually argued. Nowhere in the passage did the State make the incorrect statement of law that simply picking up and shooting a gun equates to deliberate intent to kill.

{30} Defendant argues that these three instances of prosecutorial misconduct constitute fundamental error, citing to *State v. Garvin*, 2005-NMCA-107, ¶ 20, 138 N.M. 164, 117 P.3d 970, because the State "understated what [it] was required to prove" to establish deliberate intent to kill. Defendant puts particular weight on the statements made in rebuttal because those were "the last words the jury heard before beginning deliberations." *Medema*, 2025-NMCA-011, ¶ 35. We disagree.

{31} As demonstrated above, Defendant does not prove that the State made a single misstatement of law in closing. Accordingly, Defendant's reliance on *Garvin* is misplaced. There, the defendant was charged and convicted for a single count of forgery, which required actual knowledge that the check he was trying to pass was forged. *See Garvin*, 2005-NMCA-107, ¶¶ 1, 6. During its closing, the state misstated the law by repeatedly telling jurors that they should render a guilty verdict because the defendant "had a duty to know" that the signature on the check was forged, which reduced the requisite mens rea from knowingly to negligently or recklessly. *Id.* ¶ 15 (emphasis and internal quotation marks omitted). This Court held that "the misstatements likely had such a persuasive effect as to cause the jury to convict the defendant based on a less than criminal state of mind." *Id.* ¶ 21.

{32} To the extent the State's arguments were imprecise, we will not disturb the jury's judgment on that basis. Imprecise arguments, as opposed to actual misstatements of law, do not amount to prosecutorial misconduct, let alone

fundamental error. *See State v. Duffy*, 1998-NMSC-014, ¶ 53, 126 N.M. 132, 967 P.2d 807 ("[T]he prosecutor's statements may have been somewhat imprecise but they were not a misleading misstatement of the law."), *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37 n.6; *State v. Paiz*, 2006-NMCA-144, ¶ 54, 140 N.M. 815, 149 P.3d 579 ("Although somewhat imprecise, the statement could not be said to have compromised the fundamental fairness of the proceedings.").

{33}    Finally, so long as the jury is properly instructed, the State "did not have a particular responsibility to explain the distinction [between attempted first- and second-degree murder] in closing." *State v. Carrasco*, 2007-NMCA-152, ¶ 14, 143 N.M. 62, 172 P.3d 611. At trial, the correct jury instructions for first-degree murder by deliberate killing were read by the district court prior to the State's closing statement, and were closely referenced in closing arguments by both defense and the State. At one point during its closing, the State projected for the jury the first-degree murder instructions related to Defendant's charges and read from them directly, along with the lesser included offense of second-degree murder. For its part, the defense specifically focused on the deliberate intent instruction by reading it slowly and emphatically to the jury. And in rebuttal, the State reiterated that the jury instruction "is the law" and that the jury "can only focus on the evidence and the testimony presented and what that evidence and testimony shows."

{34}    In sum, we detect no error in the State's comments addressing intent.

**C.    The State's "Visualization Exercise" During Opening and Closing Remarks**

{35}    Last, Defendant challenges certain statements made by the State in its opening statement and closing arguments as improperly "invit[ing] the jury to convict based on an emotional appeal rather than the elements of the offenses." We agree that these statements were improper but, as we explain below, we do not hold that they amounted to fundamental error.

{36}    During its opening argument, the State led the jury in a visualization exercise, directing the jury as follows:

> I just want everybody to close their eyes for a moment and listen to the next things I'm going to say. I want you to visualize yourself sitting in your car in the driver's seat. It's a bright sunny day. You're sitting there looking right through your windshield. I want you to imagine if someone wanted to kill you, where would a bullet have to go through to hit you in a fatal area on your body—your head, your heart. I want you to visualize that bullet hole in your windshield, in the glass of your windshield. And I want you to take a second and feel how you're feeling about that. What did that make you feel like?

The State then recalled that exercise in its closing argument while showing a photograph of a bullet hole in one of the officer's windshields, telling the jurors:

> [D]uring my opening . . . I asked all of you to close your eyes and visualize this very thing, right? . . . This is not imagination, this is reality right here. This is a real photo depicting a bullet hole from the incident that day involving [D]efendant. So it's manifested out here on this piece of paper, what I asked you to visualize that day in my opening. Sitting in your driver's seat, looking out through the front windshield and imagining a bullet hole, okay? And I want you to take into account what the officers were feeling that day, what they saw was going to happen to them.

{37} We agree with Defendant that these statements are improper, erroneous, and prosecutorial misconduct. The State concedes the comments were "awkward at best." But the problem is not that the visualization exercise might have been awkward. The problem is that the State's comments improperly invited the jurors to see themselves in the position of the victims, which could have caused them to render a verdict based on emotion and not on the careful weighing of the evidence. So-called "golden rule arguments," in which jurors are asked to put themselves in the place of the victims, are "universally condemned because [they] encourage[] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (internal quotation marks and citation omitted). Unsurprisingly, these arguments also contradict our Supreme Court's uniform jury instruction, which states that "[n]either sympathy nor prejudice should influence your verdict." UJI 14-6006 NMRA.

{38} We understand that the State might have hoped that this exercise would illustrate the threat the officers faced and the intent behind the placement of the bullets to argue how certain elements had been met. But asking the jurors to imagine someone trying to kill them, place themselves in the physical position of the victims, and consider their feelings about that prospect, crosses the line into argument that is clearly prohibited. We reiterate that "[a] guilty verdict must be based upon the

evidence and the reasonable inferences therefrom, not on an irrational response which may be triggered if the prosecution unfairly strikes an emotion in the jury." *State v. Sena*, 2020-NMSC-011, ¶ 21, 470 P.3d 227 (internal quotation marks and citation omitted).

{39} It does not necessarily follow, however, that these improper remarks constitute fundamental error warranting reversal. To determine whether an error rises to the level of fundamental error, we must "presum[e] that the verdict was justified," *Sosa*, 2009-NMSC-056, ¶ 37, and the defendant bears the burden of rebutting that presumption. *See id.* ¶ 36. An error is fundamental only if intervention by an appellate court is necessary to prevent "a miscarriage of justice." *Id.* ¶ 41. To determine whether an improper and erroneous argument amounts to fundamental error, we look to three factors:

(1)  whether the statement invades some distinct constitutional protection;

(2)  whether the statement is isolated and brief, or repeated and pervasive; and [finally]

(3)  whether the statement is invited by the defense.

*See id.* ¶ 26. We evaluate these factors "objectively in the context of the prosecutor's broader argument and the trial as a whole." *Id.*

{40} Under the first prong of the test, our courts have found fundamental error where, for example, a prosecutor commented on a defendant's post-*Miranda* silence, and where repeated reference was made to a defendant's lack of consent to a

warrantless search. *See, e.g.*, *Allen*, 2000-NMSC-002, ¶ 27; *Garcia v. State*, 1986-NMSC-007, ¶ 10, 103 N.M. 713, 712 P.2d 1375. No distinct constitutional protection is implicated by the State's improper comments here.

{41} Second, such error may be reversible where it is "pronounced and persistent, with a probable cumulative effect upon the jury." *State v. Diaz*, 1983-NMCA-091, ¶ 21, 100 N.M. 210, 668 P.2d 326 (internal quotation marks and citation omitted). By calling back to the visualization exercise during closing we consider the error "pronounced." However, we see no indication that the jury was improperly swayed by these comments for the reasons discussed below.

{42} We review the trial as a whole to determine whether "the prosecutor's comments materially altered the trial or likely confused the jury by distorting the evidence." *Sosa*, 2009-NMSC-056, ¶ 34. Defendant must persuade us "that the prosecutor's conduct created a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *Id.* ¶ 35 (text only) (citation omitted).

{43} The State's improper argument went to Defendant's general intent to kill the officers, and Defendant concedes there was ample evidence presented at trial to support that finding. As noted above, Defendant's multiple shots towards the heads of the officers, as supported by both the testimony of the officers and the physical evidence, palpably demonstrate an intent to kill. The overwhelming evidence of

Defendant's intent to kill makes it less likely that the prosecutor's conduct was a significant factor in the jury's deliberations. *See id.*

{44} Finally, Defendant did not "open the door" or otherwise invite the State's arguments. We note however, Defendant responded to the arguments, immediately criticizing then leveraging the improper visualization argument in his own opening statement:

> When they ask you to visualize and close your eyes and visualize what happened, I would expect to have seen a video, a lapel cam, of what happened. Ladies and gentlemen, that is something that causes me to hesitate. Instead of imagining being shot at. I would expect to have what's called a toolmark expert, somebody who would have said this is where the bullets were shot, this is where they came through, this is the angle, this is the speed, a ballistics expert. This is how fast the cars were going, an accident reconstructionist: here's the PIT maneuver, here's what happened, here's this, here's that . . . . It's not your job to think about what is happening because you're not supposed to speculate. That causes me to hesitate.

We do not intend to disadvantage Defendant for effectively responding to improper arguments by the State. We simply note that our review requires us to consider the entirety of the trial record.

{45} Based on our review of the whole record and considering the specific arguments made by Defendant in this case, we conclude that Defendant "has not carried his burden to establish the existence of fundamental error." *State v. Astorga*, 2016-NMCA-015, ¶ 13, 365 P.3d 53; *see also State v. Baca*, 1997-NMSC-059, ¶ 55, 124 N.M. 333, 960 P.2d 776 (prosecutorial misconduct in closing argument that

compared victim and his mother to "'the Madonna holding Jesus off the cross'" did not amount to fundamental error), *abrogated by State v. Revels*, 2025-NMSC-021, 572 P.3d 974.[2]

{46} Although we do not order a new trial today, we conclude with a cautionary note for the State. "A prosecutor represents the public interest and must ensure *above all else* that a criminal defendant receives a fair trial." *State v. Torres*, 2012-NMSC-016, ¶ 3, 279 P.3d 740 (emphasis added) (internal quotation marks and citation omitted). Golden rule arguments, such as those made in this case, are incompatible with that fundamental duty. Such arguments also create risks for the prosecution itself: mistrial orders and reversals of convictions on appeal. While we have no reason to believe that the prosecution did so here, we caution prosecutors against seeking to exploit deferential standards of review—particularly review for fundamental error—in the hope that convictions will survive despite the use of

---

[2]Defendant cites multiple out-of-state cases in support of his argument, all of which we find unpersuasive. Nearly all of those authorities confront prosecutors' arguments that were objected to at trial and thus not subject to review for fundamental error. *See Commonwealth v. Cherry*, 378 A.2d 800 (Pa. 1977); *State v. Reese*, 633 S.E.2d 898 (S.C. 2006); *Holliman v. State*, 2010-KA-00397-SCT. (Miss. 2011). One of those cases, *Palma*, 473 F.3d at 902, assessed a preserved golden rule argument. There the Eighth Circuit did not find an abuse of discretion by the district court, which declined to grant a mistrial and did not provide a curative instruction. *Id*. at 901-03. The only out-of-state case cited that featured an *unpreserved* challenge to an improper argument, *Commonwealth v. Bizanowicz*, 945 N.E.2d 356 (Mass. 2011), did not result in reversal.

improper arguments. *See State v. Cooper*, 2000-NMCA-041, ¶ 16, 129 N.M. 172, 3 P.3d 149.

**D.      There Was No Cumulative Error**

{47}      As noted above, the State's presentation was not without missteps. We hold, however, that only one of the State's alleged improprieties amounted to error, and that error was not fundamental. Because the cumulative error doctrine can apply only where there are multiple errors, *see State v. Salas*, 2010-NMSC-028, ¶ 39, 148 N.M. 313, 236 P.3d 32, there can be no cumulative error here. *Cf. State v. Baca*, 1995-NMSC-045, ¶ 39, 120 N.M. 383, 902 P.2d 65 (finding reversible cumulative error where "the trial court made several egregious errors, including improperly admitting hearsay testimony without providing the defense with an opportunity to rebut the evidence and improperly excluding evidence that was to be used to impeach the [s]tate's primary witness").

**III.     Defendant's Convictions for Attempted Murder and Assault on a Peace Officer Do Not Violate Double Jeopardy**

{48}      Defendant argues that "the time has come to reconsider" *State v. Demongey*, 2008-NMCA-066, 144 N.M. 333, 187 P.3d 679 and *State v. Urquizo*, 2012-NMCA-113, 288 P.3d 919. *Demongey* and *Urquizo* held that convictions for both attempted murder and assault on a peace officer are not violative of double jeopardy under a double-description argument. We disagree for the reasons that follow.

{49}     We evaluate double-description claims according to the two-part test articulated in *Swafford v. State*, 1991-NMSC-043, 112 N.M. 3, 810 P.2d 1223. First, we look to see "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes." *Id.* ¶ 25. The parties concede that Defendant's conduct was unitary, as to the shots fired toward each officer, for the purposes of our double jeopardy analysis. Although we are not required to accept the parties' concession, "we accept it under the facts of this case as supported by our precedent and offer a brief analysis." *State v. French*, 2021-NMCA-052, ¶ 17, 495 P.3d 1198.

{50}     Second, we look at "the statutes at issue to determine whether the legislature intended to create separately punishable offenses." *Swafford*, 1991-NMSC-043, ¶ 25. This Court has been repeatedly asked to determine whether the Legislature intended to create separately punishable offenses for crimes similar to those for which Defendant was convicted. *See, e.g.*, *Urquizo*, 2012-NMCA-113, ¶ 12 ("The social harm targeted by the crime of aggravated battery upon a peace officer is distinct from that targeted by the crime of attempted murder. Aggravated battery upon a peace officer falls within an entirely different article of the Criminal Code . . . , entitled 'Interference with Law Enforcement,' than does general aggravated battery or attempted murder."). And we have repeatedly held that the general prohibition against homicide is different than the specific prohibitions against

impeding peace officers in the discharge of their duties. *Id.* ¶¶ 12-14; *Demongey*, 2008-NMCA-066, ¶¶ 22-23. The reasons for this distinction are numerous, and our analysis on this question has not changed. *See Urquizo*, 2012-NMCA-113, ¶¶ 12-14 (discussing the likelihood that these crimes will be committed together, the different types of social harm targeted by the statutes, and the Legislature's specificity in placing crimes against peace officers in a separate and distinct section of the New Mexico statutes).

{51} Defendant argues that *Urquizo* and *Demongey* should be overturned because "[o]ur double jeopardy jurisprudence has continued to grow away from the historical strict mechanical elements test and increasingly toward a substantive sameness analysis." *State v. Montoya*, 2013-NMSC-020, ¶ 46, 306 P.3d 426. It is true that this Court has of late issued nonprecedential opinions holding that convictions for battery on a household member alongside other assaultive crimes violate double jeopardy, but none of those cases involve convictions for impeding peace officers in the discharge of their duties. *See State v. Perez*, A-1-CA-37025, mem. op. (N.M. Ct. App. Nov. 15, 2019) (nonprecedential); *State v. Francis*, A-1-CA-35792, mem. op. (N.M. Ct. App. Nov. 22, 2019) (nonprecedential); *State v. Trejo-Vigil*, A-1-CA-39183, mem. op. (N.M. Ct. App. Dec. 13, 2022) (nonprecedential). We are unwilling to collapse that distinction where the Legislature has created additional protections for peace officers.

{52}    We continue to hold that convictions for attempted murder and aggravated assault on a peace officer do not constitute double jeopardy, even when the convictions arise out of unitary conduct. We therefore affirm Defendant's convictions for attempted first-degree murder, charged as Counts 1 and 2; and for aggravated assault on a peace officer, charged as Counts 3 and 4.

## IV.    We Vacate Defendant's Conviction for Shooting From a Motor Vehicle

{53}    Finally, Defendant requests that we vacate his conviction for shooting from a motor vehicle because it was based on the same conduct as his convictions for attempted murder and for assault on a peace officer. The State concedes that the conviction should be vacated. This concession is not binding, *see State v. Comitz*, 2019-NMSC-011, ¶ 25, 443 P.3d 1130, but having independently assessed Defendant's claims, we accept the State's concession as correct.

{54}    The State's theory of the case shows that the charges for shooting from a motor vehicle are based on the same acts of shooting as the convictions for attempted murder and aggravated assault on a peace officer. *See State v. Porter*, 2020-NMSC-020, ¶ 21, 476 P.3d 1201 ("Whether one offense subsumes the other depends entirely on the State's theory of the case."). Our Supreme Court has previously held that convictions for shooting at a motor vehicle and homicide when premised on the same shooting constitute double jeopardy. *Montoya*, 2013-NMSC-020, ¶ 54. Similarly, we agree that allowing Defendant's convictions to stand for both attempted first-

degree murder and shooting from a motor vehicle would violate his double jeopardy protections. Because shooting from a motor vehicle violates double jeopardy alongside attempted first-degree murder, we need not determine whether it is violative alongside Defendant's convictions for assault on a peace officer.

{55} Moreover, our analysis would be identical. "[W]here one of two otherwise valid convictions must be vacated to avoid violation of double jeopardy protections, we must vacate the conviction carrying the shorter sentence." *Id.* ¶ 55. Because we uphold Defendant's convictions for attempted murder, we vacate his conviction for shooting from a motor vehicle, which was Count 7 below.

**CONCLUSION**

{56} We affirm all counts of conviction with the exception of Defendant's conviction for shooting from a motor vehicle, which we vacate as a double jeopardy violation. We remand this case to the district court for amendment of the judgment and sentence consistent with this opinion.

{57} **IT IS SO ORDERED.**

_____
**KRISTOPHER N. HOUGHTON, Judge**

**WE CONCUR:**

_____
**ZACHARY A. IVES, Judge**

_____
**SHAMMARA H. HENDERSON, Judge**